IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| TIFFANY ANDREWS BECK, etc., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 25-0454-WS-MU |
| | ) | |
| 4US CORP., et al., | ) | **PUBLISH** |
| | ) | |
| **Defendants.** | ) | |

## ORDER

This matter is before the Court on the plaintiff's motion to remand, (Doc. 14), and on the motion of one defendant ("DTNA") for leave to conduct jurisdictional discovery. (Doc. 22). The interested parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 15-17, 21-22, 24-27),[1] and the motions are ripe for resolution. After careful consideration, the Court concludes that DTNA's motion is due to be denied and the plaintiff's motion granted.

## BACKGROUND

The plaintiff's decedent was struck by a Freightliner Cascadia truck owned and operated by one defendant ("4US") and driven by its employee, the individual defendant ("Dmyterko"). According to the crash report, (Doc. 1-2), four vehicles were stopped at a highway red light when the Freightliner struck the rear vehicle at a high rate of speed, pushing that vehicle into the other stopped vehicles in front of it. The front stopped vehicle was pushed almost 120 yards, and its driver was taken to a local hospital. The second stopped vehicle ended upside down some 130 yards from impact, and its driver was taken to a local hospital after being pulled from the flames by bystanders. The third

---

[1] All evidentiary materials, and all but one brief, have been filed by the plaintiff or DTNA.

stopped vehicle was flipped upside down 80 yards from impact; its driver -- the plaintiff's decedent -- was pronounced dead at the scene. The fourth stopped vehicle, with which the Freightliner initially collided, was pushed 130 yards; it burst into flames that quickly engulfed it and its driver. All told, two persons were killed and four transported for immediate medical treatment. The Freightliner came to rest over 250 yards past the point of impact; its first braking skid mark was noted over 150 yards past the point of impact.

The incident occurred on May 6, 2025. Two days later, a criminal complaint was filed against Dmyterko, asserting two claims of homicide by vehicle, one for each of his victims. (Doc. 1-10). In August 2025, a grand jury indicted Dmyterko on two such counts, plus two counts of criminally negligent homicide. (Doc. 21-4). If convicted, Dmyterko could be sentenced to up to ten years as to each victim. Ala. Code §§ 13A-5-6(a)(3), 13A-6-4, 32-05A-190.1. Dmyterko is also a defendant in multiple civil lawsuits arising from the incident. (Doc. 26-1 at 2).

The decedent held a policy of insurance, which included uninsured/underinsured motorist ("UM/UIM") coverage, issued by another defendant ("Alfa"). The other four named defendants, including DTNA, are alleged to have been involved in the design, manufacture, testing, distribution, etc. of the Freightliner. Claims of negligence and wantonness are asserted against Dmyterko. Those claims, along with claims of negligent and wanton entrustment, are asserted against 4US. A claim for UM/UIM benefits is asserted against Alfa. Claims of negligence, wantonness, and under the AEMLD are asserted against the remaining named defendants.

Removal was accomplished by DTNA on the basis of diversity. (Doc. 1). The plaintiff seeks remand on two grounds: (1) that diversity is lacking in that Alfa shares the plaintiff's Alabama citizenship; and (2) that removal is procedurally defective because Dmyterko has neither joined in nor consented to removal.

## DISCUSSION

"A party removing a case to federal court based on diversity of citizenship bears the burden of establishing the citizenship of the parties." *Purchasing Power, LLC v.*

2

*Bluestem Brands, Inc.*, 851 F.3d 1218, 1225 (11th Cir. 2017) (internal quotes omitted). "The removing defendant's burden extends to demonstrating, when properly challenged, its compliance with the procedural requirements for removal." *Tucker v. Equifirst Corp.*, 57 F. Supp. 3d 1347, 1349 (S.D. Ala. 2014).

As discussed in Part I, subject matter jurisdiction is lacking unless Alfa is a nominal defendant such that its citizenship can be ignored. The burden is thus on DTNA to demonstrate that Alfa is a nominal party. *Teledyne Continental Motors, Inc. v. Vibratech, Inc.*, 2008 WL 11426864 at *4 (S.D. Ala.) (Milling, M.J), *report and recommendation adopted*, 2008 WL 11426863 (S.D. Ala. 2018).

As discussed in Part II, the removal is procedurally defective unless Dmyterko is a nominal defendant such that his consent to removal is not required. The burden is thus on DTNA to demonstrate that he is a nominal party. *Brandenburg v. Burns*, 2019 WL 5692742 at *5 (S.D. Ga. 2019); *Hoar Construction, LLC v. Markel Service, Inc.*, 2018 WL 8260864 at *4 (S.D. Fla. 2018).

## I.  Subject Matter Jurisdiction.

Because the plaintiff is the personal representative of the decedent's estate, (Doc. 1-5 at 49), she "shall be deemed to be a citizen only of the same state as the decedent." 28 U.S.C. § 1332(c)(2).  The amended complaint alleges that the plaintiff is a resident citizen of Camden, Alabama, (Doc. 1-5 at 50), but it does not allege the citizenship of the decedent.  The parties, however, have made assertions sufficient to persuade the Court that the decedent was, at the time of his death, also a citizen of Alabama.[2]

---

[2] DTNA points to the crash report, (Doc. 1 at 3-4), which indicates that the decedent held an Alabama driver's license and was a coach/teacher at an Alabama school.  (Doc. 1-2 at 3).  The plaintiff in brief describes the decedent as her husband, (Doc. 14 at 8, 16), and the crash report indicates her residence as Camden, Alabama. (Doc. 1-2 at 3).  Finally, the plaintiff directly asserts that the decedent was an Alabama citizen.  (Doc. 24 at 2).

Alfa admits it is a citizen of Alabama, (Doc. 1-5 at 53; Doc. 7 at 2), and sister courts have routinely so declared.[3]  "A district court may exercise diversity jurisdiction only if there is complete diversity between the parties, that is, no two adverse parties are citizens of the same state." *Ranbaxy Laboratories Inc. v. First Databank, Inc.*, 826 F.3d 1334, 1338 (11th Cir. 2016).  The plaintiff invokes this rule to argue that the common citizenship of the decedent and Alfa negates subject matter jurisdiction.  (Doc. 15 at 19-20).  DTNA counters that Alfa is a nominal party whose citizenship must be ignored in performing the diversity calculus.  (Doc. 1 at 7-9).

"[A] federal court must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy." *Navarro Savings Association v. Lee*, 446 U.S. 458, 461 (1978).  State substantive law determines whether a party is nominal or is a "real and substantial party to the litigation." *Broyles v. Bayless*, 878 F.2d 1400, 1402 (11th Cir. 1989).  DTNA, relying on *Broyles* and sister courts employing *Broyles*, asserts that Alfa is a nominal party.  The plaintiff offers a single objection, which the Court will address in due course.  However, because its subject matter jurisdiction is at stake, and because it has not had previous occasion to identify or apply the proper methodology for making the jurisdictional determination in this context, the Court first scrutinizes DTNA's argument and authority in some detail.  And because it impacts the parties' arguments on both the jurisdictional and the procedural issue, the Court begins with a survey of governing law regarding how to identify nominal parties.

### A.  Nominal Party Jurisprudence.

Over two centuries ago, it was established that "[t]his Court will not suffer its [diversity] jurisdiction to be ousted by the mere joinder or non-joinder of formal parties ...." *Wormley v. Wormley*, 21 U.S. 421, 451 (1823).  The same rule applies to nominal parties. *Id.*; *Wilson v. Oswego Township*, 151 U.S. 56, 63-64 (1894).  The Supreme Court has identified the dividing line as lying between nominal or formal parties on the

---

[3] *E.g., James v. Mejia*, 512 F. Supp. 3d 1255, 1256 (M.D. Ala. 2021).

one hand and "real parties" on the other. *Wood v. Davis*, 59 U.S. 467, 469 (1855) ("It has been repeatedly decided by this court, that formal parties, or nominal parties, or parties without interest, united with the *real parties* to the litigation, cannot oust the federal courts of [diversity] jurisdiction, if the citizenship, or character of the *real parties*, be such as to confer it ...." ) (emphasis added). *Navarro* confirms that this dichotomy survives.

But what is a "real party"?  Contemporaneously with *Wood*, the Supreme Court identified three classes of parties to a bill in equity:  formal, necessary, and indispensable. *Shields v. Barrow*, 58 U.S. 130, 139 (1854).  The Court soon confirmed that, for jurisdictional purposes, real parties are necessary or indispensable parties.  Thus, the *Wood* Court equated "real parties" with "proper or necessary parties in the suit."  59 U.S. at 469.  This pattern continued.  *See, e.g., Lee v. Lehigh Valley Coal Co.*, 267 U.S. 542, 543 (1925) (affirming dismissal for lack of jurisdiction because a non-diverse party "was a 'necessary' even if not an indispensable party"); *Salem Trust Co. v. Manufacturers' Finance Co.*, 264 U.S. 182, 190 (1924) ("On the question of jurisdiction, an unnecessary and dispensable party, will not be considered."); *Wilson*, 151 U.S. at 65 (diversity was lacking because the bailee or trustee of certain bonds "was a necessary and indispensable party to the relief"); *Bacon v. Rive*s, 106 U.S. 99, 104 (1882) (action was removable because non-diverse executors "were neither necessary nor indispensable parties").

As noted, *Shields* identified necessary parties and indispensable parties as two different classes of party.  Jurisdictional cases maintain the distinction. *E.g., Lee*, 267 U.S. at 543 (half-owner "was a 'necessary' *even if not* an indispensable party") (emphasis added); *Bacon*, 106 U.S. at 104 (executors "were *neither* necessary *nor* indispensable parties") (emphasis added).  A party therefore is a real party rather than a nominal party if it is *either* an indispensable party *or* a necessary party.  For jurisdictional purposes, the dividing line is between necessary parties and nominal parties, not between necessary parties and indispensable parties or between nominal parties and indispensable parties. *E.g., Wilson*, 151 U.S. at 65 (counting the citizenship of a "necessary and indispensable

5

party" but not that of a "formal, unnecessary, or nominal party"); *accord Nunn v. Feltinton*, 294 F.2d 450, 453 (5th Cir. 1961).

How then to distinguish a necessary party from an unnecessary or nominal party? It is a matter of interest. *Shields* identified necessary parties in the equity context as those "having an interest in the controversy" and who ought to be named in order to determine the entire controversy in a single action. 58 U.S. at 139. In the jurisdictional context, the Supreme Court likewise focuses on the party's interest in the controversy. *See Salem Trust*, 264 U.S. at 190 (a defendant obligated only to pay over the amount deposited with it once the litigation determined which of the other parties was entitled to it "ha[d] no interest in the controversy" and was an unnecessary and dispensable party); *Wilson*, 151 U.S. at 65 (a bond issuer "was a proper if not a necessary party, as it had an interest in the question whether [the plaintiff] had performed his contract and earned the bonds"); *Bacon*, 108 U.S. at 104 (executors "were neither necessary nor indispensable parties" because they "had no interest in the question whether the complainants have or not a cause of action against" an heir).

Interest in the controversy is so central to the concept of real parties that the *Wood* Court asked whether certain defendants "were parties *in interest* in the subject of litigation, or, *in other words*, were proper or necessary parties." 59 U.S. at 469 (emphasis added). The Court equated "parties *without interest*" with "formal parties, or nominal parties," and distinguished them all from "the real parties to the litigation." *Id.* (emphasis added); *accord Lumbermen's Mutual Casualty Co. v. Elbert*, 348 U.S. 48, 51 (1948) (in determining whether diversity jurisdiction existed, defendant insurer was "not merely a nominal defendant but [wa]s the real party in interest here"); *accord Thermoset Corp. v. Building Materials Corp of America*, 849 F.3d 1313, 1317 (11th Cir. 2017) ("We conclude that [the non-diverse defendant] is a real party in interest and not a nominal party."). Indeed, "[t]here is a 'rough symmetry' between the 'real party in interest' standard of Rule 17 and the rule that diversity jurisdiction depends upon the citizenship of real parties to the controversy." *Navarro*, 446 U.S. at 462 n.9.

6

### B. The Applicability of *Broyles*.

The plaintiff in *Broyles*, a Tennessee citizen, sued the Georgia tortfeasor and, in accordance with Tennessee law, served his UIM carrier (also a Tennessee citizen) with process but without naming it as a defendant. By this procedure, the insurer gained the right to file pleadings and take other action in its own name or that of the tortfeasor. 878 F.2d at 1401, 1402-03 (addressing Tenn. Code Ann. § 56-7-1206(a)). After a bench trial on liability, the district court dismissed the action for lack of complete diversity, *id*. at 1401, but the panel did "not agree that an insurance company's legal right to be a party in a lawsuit, without more, confers 'real party in interest' status upon that company." *Id*. at 1403. "Because the Tennessee courts place the uninsured motorist carrier in the same position as that of the tortfeasor's own insurer, [the UIM carrier's] status as a party turns on the same principles as are generally applied in liability insurance law," *id*., which the panel then discussed as follows. "Because of the indirect and invisible roles often played by insurance companies in tort litigation, courts generally do not recognize these companies as real parties to an action ...." *Broyles*, 878 F.2d at 1404. The panel identified three exceptions to the general rule: (1) when the insurer "ha[s] become subrogated to the rights of their insured after payment of the loss"; (2) when the insurer is "defending actions brought directly against" it; and (3) "when, for some reason, [the insurer] must assume primary and visible control of the litigation." *Id*.

Most sister courts addressing the issue have concluded or assumed that *Broyles* supplies the governing analysis when Alabama substantive law applies. The principal exception is *Smith v. Brazee*, 2010 WL 11614078 (N.D. Ala. 2010). Judge Hopkins' thoughtful opinion deserves thoughtful consideration and response, which the Court will endeavor to provide.

*Smith* first compared Tennessee law to Alabama law and concluded that their "differences are not negligible and render the *Broyles* opinion inapposite when applied to the relevant Alabama, not Tennessee, law." 2010 WL 11614078 at *9. The differences

that *Smith* identified are that Alabama,[4] unlike Tennessee,[5] permits a direct action against a UM/UIM carrier and permits such an action without the plaintiff first obtaining judgment against the tortfeasor. *Id*. These differences are real, but the question is whether they preclude *Broyles* from operating in this case. As discussed in Part I.C.2, the plaintiff has not brought a direct action against Alfa, so the factual situation here does not differ in that respect from that in *Broyles*. The difference in state law thus matters only if the legal unavailability of a direct action is a necessary predicate to *Broyles'* test.

As noted, *Broyles'* general rule and three exceptions reflect the principles generally applied in liability insurance law. 878 F.2d at 1403. Those principles applied in *Broyles* because Tennessee law "place[d] [UM/UIM] carrier[s] in the same position as that of the tortfeasor's own insurer." *Id*. In determining that Tennessee law did so, the *Broyles* panel noted: (1) the scheme imposed by Section 56-7-1206; (2) judicial opinions confirming that the statute's purpose is to "'mak[e] the insurance carrier stand as the insurer of the uninsured motorist'"; and (3) Tennessee's disallowance of direct actions against a UM/UIM carrier. 878 F.2d at 1403 (quoting *Glover v. Tennessee Farmers Mutual Insurance Co.*, 468 S.W.2d 727, 730 (Tenn. 1971) (emphasis omitted)).

It seems clear that only the first two of these circumstances were necessary to *Broyles'* conclusion. The statute created the procedure, and *Glover* expressly confirmed the Eleventh Circuit's conclusion that the statutory procedure placed UM/UIM carriers in the same position as the tortfeasor's insurer. The preclusion of a direct action might or might not support that conclusion, but it was not essential to reaching it, and nothing in the language of the opinion suggests otherwise. On the contrary, *Broyles* introduced the

---

[4] *E.g., Ex parte State Farm Mutual Automobile Insurance Co.*, 401 So. 3d 1092, 1095-96 (Ala. 2024).

[5] *Broyles*, 878 F.2d at 1403.

8

prohibition on direct actions with the transition word, "[f]urthermore," 878 F.2d at 1403, a term consistent with an additional but non-essential reason for a conclusion or position.[6]

There are other differences between Alabama law and Tennessee law, unnoted in *Smith*, but the Court does not consider them such as to render *Broyles* inapplicable.  As mentioned, under Tennessee law the UM/UIM carrier must be served with process but is not named in the complaint as a defendant.  The carrier then has the right, but not the obligation, to file pleadings and take other action, and it may do so either in its own name or in the name of the tortfeasor defendant, who may employ counsel of his own choosing. *Broyles*, 878 F.2d at 1402-03.  Under Alabama law, the plaintiff may either name the carrier as a defendant along with the tortfeasor or give the carrier notice of the action and of the possibility of a claim for UM/UIM benefits.  If the plaintiff exercises her first option, the insurer may choose either to participate in trial or not to do so.  If the plaintiff exercises her second option, the insurer may choose to intervene or not.  *Lowe v. Nationwide Insurance Co.*, 521 So. 2d 1309, 1310 (Ala. 1988).  The election not to participate after being named as a defendant is known as an "opt out."  *E.g., Terrell v. Joshua*, 390 So. 3d 1043, 1046 (Ala. 2023).

That the UM/UIM carrier is named as a defendant in an Alabama complaint but not in a Tennessee complaint is a distinction without a difference, because the *Broyles* Court treated the insurer as a party.[7]  Indeed, had it not done so, its extended discussion

---

[6] *See, e.g., United States v. Moses*, 2019 WL 4018106 at \*3 (W.D.N.Y. 2019) ("'Furthermore' means 'in addition' or 'besides,' and may be 'used to introduce a fresh consideration in an argument.'") (quoting The New Oxford American Dictionary (2001)).

[7] The panel noted the insurer's argument that "under Tennessee law it is legally a party defendant."  878 F.2d at 1401.  The panel further noted another court's statement that "'the Tennessee courts consider the uninsured motorist carrier legally a party defendant.'"  *Id.* at 1403 (quoting *Hillis v. Garner*, 685 F. Supp. 1038, 1040 (E.D. Tenn. 1988)).  *Hillis*, in turn, relied on *Thearp v. Travelers Indemnity Co.*, 504 S.W.2d 763, 766 (Tenn. App. 1972) ("[W]e hold that Travelers, after being regularly served with process, became legally a party defendant in the tort cases though not so designated by name.").  *Broyles* itself also cited *Thearp*.  878 F.2d at 1403.

of, and ultimate ruling regarding, what kind of party the insurer was -- nominal or real -- would have been pointless if not meaningless.[8]

Whether *Broyles* applies in Alabama does not depend on a precise mimicry of the Tennessee scheme but on whether Alabama law, like Tennessee law, "place[s] the uninsured motorist carrier in the same position as that of the tortfeasor's own insurer." 878 F.2d at 1403.  As described in *Glover* and quoted in *Broyles*, Tennessee law:  ensures the UM/UIM carrier receives notice of the action against the tortfeasor; provides the carrier an opportunity to defend the tortfeasor without requiring it to do so; keeps the fact of potential insurance coverage from the jury unless the carrier injects it; and binds the carrier to any judgment rendered against the tortfeasor.  878 F.2d at 1403.  Alabama law accomplishes all of this.  *Lowe*, 521 So. 2d at 1310.  The Court thus agrees with those sister courts that, after applying their own analysis, have concluded that *Broyles* applies in Alabama.  *Germinaro v. Null*, 623 F. Supp. 3d 1283, 1288 (M.D. Ala. 2022) (Marks, C.J.); *Toole v. Chupp*, 456 F. Supp. 2d 1218, 1221 (M.D. Ala. 2006) (Thompson, D.J.).

Under the third *Broyles* exception, a UM/UIM carrier that "cannot or does not exercise the option to actively and visibly defend that lawsuit ... lacks the requisite control over the litigation to be a real party in interest for diversity purposes."  878 F.2d at 1406.  The *Smith* Court objected that the third exception is invalid because it conflicts with Supreme Court precedent.  2010 WL 11614078 at *9.  *Smith* quoted *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1983) ("*Bauxites*"), for the proposition that "no action of the parties can confer subject-matter jurisdiction upon a federal court," *id*. at 702, and it concluded that the *Broyles* approach impermissibly allows the UM/UIM carrier, "through its actions, [to] confer or strip subject matter jurisdiction," giving it "power to control the jurisdiction of this court." 2010 WL 11614078 at *9.

The short answer to this objection is that district courts have no authority to reject Eleventh Circuit precedent based on their perception that such precedent ignored or

---

[8] The *Broyles* Court expressly recognized that one must first be a party before one can be a real and substantial party to the litigation.  878 F.2d at 1402.

misapplied existing Supreme Court precedent. "Under our prior panel precedent rule, a panel cannot overrule a prior one's holding even though convinced it is wrong." *Smith v. GTE Corp.*, 236 F.3d 1292, 1302 (11th Cir. 2001) (en banc) (internal quotes omitted). No "exception to the prior panel precedent rule exists where the first panel to address an issue failed to follow and apply controlling Supreme Court precedent." *Id*. If a subsequent Eleventh Circuit panel is bound by *Broyles* despite its conflict, if any, with prior Supreme Court cases, district courts certainly are so bound.

The longer answer is that *Broyles* is not in conflict with *Bauxites*. That case centered on personal jurisdiction, and the Supreme Court discussed subject matter jurisdiction only to distinguish it from personal jurisdiction -- in particular, that the latter, but not the former, is subject to excuse by waiver and estoppel. 456 U.S. at 701-04. Subject matter jurisdiction, in contrast, cannot be conferred by consent, estoppel, or waiver. *Id*. at 702. These are the "action[s] of the parties" to which the *Bauxites* Court referred.

*Bauxites* stands for the unremarkable propositions that, for subject matter jurisdiction to exist, the constitutional and statutory requirements for such jurisdiction must be met, and that the actions of the parties are no substitute for actually meeting those requirements. 456 U.S. at 702.[9] *Bauxites* does not stand for the proposition that the actions of the parties can never inform whether those constitutional and statutory requirements have been met.

The Constitution extends the judicial power "to Controversies ... between citizens of different States." U.S. Const. art. III, § 2. The United States Code grants to the district courts original jurisdiction of "all civil actions [with an amount in controversy exceeding $75,000] between ... citizens of different States." 28 U.S.C. § 1332(a)(1). Fleshing out the limits of this authority has been the work of the courts, including the rule of disregarding nominal parties. Numberless factual issues permeate the jurisdictional

---

[9] Thus, for example, a plaintiff and a defendant, citizens of the same state, cannot confer diversity jurisdiction by agreeing to, or failing to object to, a federal forum.

11

inquiry, from determining the citizenship of each party to deciding whether to ignore a named party as nominal, fraudulently joined, or otherwise, and the "action of the parties" necessarily figures into these determinations.  An individual party's citizenship, for example, is a function of her domicile, which in turn may be supported or challenged by all manner of her actions.[10]  Considering the actions of a UM/UIM carrier in determining the relevance of its citizenship is of a piece with the factual assessments made elsewhere in the diversity calculus.

*Bauxites* and the other cases cited by *Smith* address the "confer[ring]" of jurisdiction, but *Smith* also objected to a UM/UIM carrier, by its actions, "strip[ping]" jurisdiction that has already attached (by participating to a sufficient degree in the litigation).  Such a result, though unusual, is not unique; Congress permits a plaintiff to strip subject matter jurisdiction over a removed action by adding, post-removal, a non-diverse defendant.  28 U.S.C. § 1447(e).  Moreover, a plaintiff may (or may not) initiate a remand in a non-diversity case by amending its complaint to eliminate all federal causes of action.  *Parker v. Exterior Restorations, Inc.*, 601 F. Supp. 3d 1221 (S.D. Ala. 2022).  In both situations, the district court is permitted to consider whether the plaintiff is seeking to manipulate jurisdiction.  *Id*. at 1229; *Portis v. Wal-Mart Stores, Inc.*, 2007 WL 3086011 at *3 (S.D. Ala. 2007).  Although it seems unlikely that a UM/UIM carrier would elect to take an active, visible role in the litigation (and thereby risk jury awareness of insurance) for the purpose of obtaining a state forum (with its reputedly unfavorable juries), presumably the district courts are equipped to monitor for this as they do with respect to amendments to the complaint.

---

[10] *See, e.g., Molinos Valle del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1343 (11th Cir. 2011) (considering residence, retirement); *King v. Cessna Aircraft Co*., 505 F.3d 1160, 1171 (11th Cir. 2007) (considering work and career goals, purpose of travel); *Chalwest (Holdings) Ltd. v. Ellis*, 924 F.2d 1011, 1012-13 (11th Cir. 1991) (considering passport and visa entries); *McDougald v. Jenson*, 786 F.2d 1465, 1484 (11th Cir. 1986) (considering proximity to state line, driver's license, voter registration, church membership, doctor visits, child's birth); *Scoggins v. Pollock*, 727 F.2d 1025, 1026-27 (11th Cir. 1984) (considering voter registration, car registration, driver's license, location of college classes).

*Smith* next declares that "it would violate public policy if a party to a lawsuit could manipulate federal subject matter jurisdiction through its unilateral actions."  2010 WL 11614078 at *9.  As addressed above, it is unlikely that a UM/UIM carrier would deliberately "manipulate" itself into a less favorable forum, and the acknowledged ability of plaintiffs to rejigger their complaints to eliminate federal jurisdiction that has already attached suggests that public policy may not be as robust as the *Smith* Court believed.  In any event, a district court cannot decline to follow *Broyles* because it finds that decision inconsistent with public policy.

Even if *Broyles* applies in Alabama, and even if it is not fatally inconsistent with Supreme Court precedent and/or public policy, the *Smith* Court concluded that *Broyles*' test of nominality contradicts that expressed in *Tri-Cities Newspapers, Inc. v. Tri-Cities Printing Pressmen and Assistants' Local 349*, 427 F.2d 325 (5th Cir. 1970), and therefore is a nullity under the prior panel precedent rule.  2010 WL 11614078 at *11 & n.18.[11] *Smith* identified the *Broyles* test as "whether the insurer is a real party in interest."  *Id*. at *11 n.18.  The *Smith* Court considered the *Broyles* test "much more stringent" than what appears in *Tri-Cities* because it inserts "an additional element."  *Id*. at *11 n.18.

*Tri-Cities* was decided in the context of the procedural requirement that all defendants agree to removal.  427 F.2d at 326.  The Court assumes for present purposes that cases decided in the procedural context under Section 1446 apply equally in the jurisdictional context under Section 1332.  The Court, however, cannot agree that *Broyles* is in tension with *Tri-Cities*.  That panel stated, unremarkably, that "nominal or formal parties, being neither necessary nor indispensable, are not required to join in the petition for removal."  *Id*. at 327.  As noted in Part I.A, a real party in interest for purposes of diversity jurisdiction is one that is necessary or indispensable and thus not nominal or formal.  Despite the different nomenclature, there is no daylight between *Broyles* and *Tri-Cities* in this regard.

---

[11] As a decision of the former Fifth Circuit, *Tri-Cities* is binding precedent within the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

The *Smith* Court did not identify the "additional element" in *Broyles* to which it objected.  The *Tri-Cities* panel stated that "[t]he test of whether or not a named defendant is a nominal party is if his role in the law suit is that of a depositary or stakeholder."  427 F.2d at 327 (internal quotes omitted).  *Smith* quoted this sentence and apparently deemed it "the nominal party test set forth in" *Tri-Cities*.  2010 WL 11614078 at *11 & n.18.  To the uncertain extent that *Smith* believes *Tri-Cities* limited the universe of nominal parties to these particular categories, the Court cannot agree.

*Tri-Cities* involved a newspaper's suit against a local union and its associated international union asserting violation of the no-strike provision of the collective bargaining agreement ("CBA") and seeking damages and an injunction.  427 F.2d at 326.  Both the local and the international were signatories to the CBA, but the language used to describe the international's relation to the CBA was ambiguous.  The Fifth Circuit remanded for further factfinding regarding the CBA, the negotiation process, the parties' course of dealing, who was responsible for the alleged breach, and, "most important of all," against which of the entities the requested injunction would be binding and against which of them damages for breach could be imposed.  *Id*. at 326-27.  "Once [these facts] are determined, then we should be able to decide whether or not the international union was a nominal party to the proceedings."  *Id*. at 327.  That is, the *Tri-Cities* Court recognized that the international could be a nominal party based on its having no interest in the controversy, even though it obviously was not a depositary or stakeholder.  The panel's more restrictive statement of "[t]he test" for nominal status thus cannot constitute a holding that only depositaries and stakeholders can be nominal parties.[12]

For the foregoing reasons, the Court is satisfied that *Broyles* supplies the governing analysis for determining whether Alfa is a nominal party whose Alabama citizenship does not eliminate complete diversity.

---

[12] *Del Valle v. Secretary of State*, 16 F.4th 832, 842 n.5 (11th Cir. 2021) ("[D]icta is defined as those portions of an opinion that are not necessary to deciding the case then before us.") (internal quotes omitted).

### C.  The Application of *Broyles*.

"Because of the indirect and invisible roles often played by insurance companies in tort litigation, courts generally do not recognize these companies as real parties to an action unless [1] they have become subrogated to the rights of their insured after payment of the loss, [2] they are defending actions brought directly against them, or [3] when, for some reason, they must assume primary and visible control of the litigation."  *Broyles*, 878 F.2d at 1404.

#### 1.  Subrogation.

Through subrogation, "an insurance company becomes a real party in interest by procuring the right to enforce an action, as a plaintiff."  *Broyles*, 878 F.2d at 1404. Alabama recognizes "a right of subrogation in uninsured/underinsured motorist cases." *Aetna Casualty & Surety Co. v. Turner*, 662 So. 2d 237, 239-40 (Ala. 1995).  However, because Alfa has not paid the plaintiff anything and is not pursuing subrogation against the tortfeasor, the first *Broyles* exception is not in play.

#### 2.  Direct Action.

The second *Broyles* exception applies in the context of a "direct action," a term the panel used in two senses:  (1) an action against the tortfeasor's insurer, whether in addition to or in lieu of an action against the tortfeasor, as used in 28 U.S.C. § 1332(c); and (2) "any action in which the insurance company is being sued for its own acts or omissions," brought "over such issues as payment or coverage."  878 F.2d at 1404 & n.1.

This plainly is not a direct action in the first sense, because Alfa is not the insurer of 4US or Dmyterko but of the plaintiff.  *See, e.g., Bowers v. Continental Insurance Co.*, 753 F.2d 1574, 1577 (11th Cir. 1985) ("In similar situations involving suits by an insured against his own insurer under an uninsured motorist policy, courts have held that section 1332(c) does not control."); *Fortson v. St. Paul Fire and Marine Insurance Co.*, 751 F.2d 1157, 1159 (11th Cir. 1985) (similar).

15

It is more debatable whether Alfa is being sued "for its own acts or omissions" within the contemplation of *Broyles*. The panel gave as an example of a direct action under this standard an "action by [an] insured against [his] own insurer ... to collect under [an] uninsured motorist policy." 878 F.2d at 1404 n.1 (describing *Irvin v. Allstate Insurance Co.*, 436 F. Supp. 575 (W.D. Okla. 1977)). It thus appears that *Broyles* considers a simple claim for UM/UIM benefits to be one against the insurer for its own acts and omissions.[13]

The plaintiff's claim against Alfa appears to fit this description. Count Ten is styled as a "cause of action" for "uninsured or underinsured motorist coverage," it alleges that the decedent's death was the fault of an uninsured or underinsured motorist, and it demands judgment against Alfa pursuant to its policy. (Doc. 1-5 at 79-80). Alabama law recognizes this as a "claim" for "Underinsured Motorist Coverage," which claim requires the insured to prove "that the other motorist was uninsured, legally liable for damage to the insured, and the amount of this liability." *Ex parte State Farm Mutual Automobile Insurance Co.*, 401 So. 3d 1092, 1095-96 (Ala. 2024) (internal quotes omitted). Such a claim accrues, starting the six-year limitations clock, on the date of the accident. *Id*. at 1098.

Sister courts appear not to have considered the impact of *Irvin*, or *Broyles*' description of it, when assessing the second *Broyles* exception. The *Germinaro* Court ruled that a claim for UM/UIM benefits "functions as mere notice of the filing of the action against the motorist and of the possibility of a claim" for UM/UIM benefits after trial. 623 F. Supp. 3d at 1288-89. Similarly, the *Toole* Court ruled that "an uninsured motorist claim" was not "one over [the insurer's] own acts and omissions," because the plaintiffs acknowledged that their only purpose in naming the insurer was to put it on

---

[13] The plaintiff in *Irvin* sued his UM/UIM carrier under a state rule allowing the insured the option of "'fil[ing] an action directly against his insurance company without joining the uninsured motorist as a party defendant and litigat[ing] all of the issues of liability and damages in that one action.'" 436 F. Supp. at 576 n.1 (quoting *Keel v. MFA Insurance Co.*, 553 P.2d 153, 158 (Okla. 1976)). Although, unlike here, the plaintiff in *Irvin* sued only his insurer, the *Broyles* Court did not note or appear to rely on that procedural circumstance.

notice of the litigation and give it the option to participate or opt out.  456 F. Supp. 2d at 1221.  In *Stevens v. Edwards*, 2022 WL 108016 (M.D. Ala. 2022) ("*Stevens I*"), Judge Marks ruled that a count "for under/uninsured motorist benefits" was not a direct claim because, if the plaintiff's claims against the other driver and his employer "were to vanish, so would the 'claim' asserted against Alfa."  *Id*. at *4.

The Court respectfully dissents from its sister courts' reasoning.  The Court, however, does conclude that a simple claim for UM/UIM benefits, brought pursuant to *Lowe*, generally will not be a direct action for purposes of the second *Broyles* exception, even if it amounts to a suit against the insurer "for its own acts or omissions."

*Broyles*' discussion of its second exception included an additional qualifier, one that will usually negate a direct action when a plaintiff includes a claim for UM/UIM benefits under a *Lowe* paradigm:  the exception applies when "the insurance company *must* defend itself against a 'direct action.'"  *Id*. (emphasis added).  At least until the expiration of "a reasonable time after service of process, [the insurer may] elect either to participate in the trial ... or not to participate in the trial."  *Lowe*, 521 So. 2d at 1310.  Thus, until and unless the insurer elects to participate (whether by deliberate choice or by failure to opt out within a reasonable time), it is not required to defend itself, and the second exception remains unsatisfied.

An opt out coming before the deadline for amending the pleadings is at least presumptively timely.  *Ex parte Electric Insurance Co.*, 164 So. 3d 529, 531 (Ala. 2014).  Alfa's notice of election to opt out, coming 22 days after being served with process, was unquestionably timely under this standard.  Because Alfa was never subject to an obligation (as opposed to an option) to defend, the second *Broyles* exception cannot apply.

The Court has addressed a simple claim for UM/UIM benefits because that is the only claim the plaintiff brings against Alfa.  Some plaintiffs proceeding under *Lowe* have included claims for breach of contract, and at least two courts have ruled that such a claim satisfies the second *Broyles* exception.  *James v. Mejia*, 512 F. Supp. 3d 1255, 1259 (M.D. Ala. 2021) (Watkins, D.J.); *Summerlin v. Nelson*, 2017 WL 2177361 at *2

17

(M.D. Ala.) (Capel, M.J.), *report and recommendation adopted*, 2017 WL 2177337 (M.D. Ala. 2017).[14]  Because a claim for breach of contract clearly challenges the insurer's acts or omissions, and because an insurer presumably has no option not to defend a breach of contract claim (unless it is willing to suffer judgment by default), such a claim may satisfy the "direct action" exception as articulated in *Broyles*.  It would not, however, necessarily make the insurer's citizenship relevant.

"Breach-of-contract and bad-faith claims in fact are not ripe so long as genuine disputes exist as to the uninsured/underinsured motorist's liability."  *Ex parte State Farm Mutual Automobile Insurance Co.*, 401 So. 3d 1092, 1096-97 (Ala. 2024).  "Ripeness implicates subject-matter jurisdiction," and the absence of such jurisdiction requires dismissal without prejudice.  *Pontius v. State Farm Mutual Automobile Insurance Co.*,

---

[14] *James*, 512 F. Supp. 3d at 1258 (the *Summerlin* Court concluded that Alfa was not a nominal party "because the company was defending an action brought directly against it."); *id*. at 1259 ("Here, as in *Summerlin*, ALFA is not a nominal party because the record indicates that it is defending an action brought directly against it.").  In reaching this conclusion, both *James* and *Summerlin* examined the degree of Alfa's participation in the lawsuit and concluded that, while such participation was too limited to support the third *Broyles* exception, it was enough to confirm that Alfa was "defending" the breach of contract claim brought against it.  *Id*.; *Summerlin*, 2017 WL 2177361 at *4.  With respect, the Court suggests that the second *Broyles* exception was satisfied regardless of whether Alfa was actively defending the claim against it.

It is true that *Broyles* described the second exception as arising when insurers "*are defending* actions brought directly against them," 878 F.2d at 1404 (emphasis added), but the Court is skeptical that the Eleventh Circuit requires the insurer's actual, active defense of the direct action as an element of the exception.  As support for the second exception, *Broyles* relied on two cases.  It cited *Lumbermen's Mutual Casualty Co. v. Elbert*, 348 U.S. 48 (1954), for the proposition that an insurer is a real party in interest "when *plaintiff brings* direct action," 878 F.2d at 1404 (emphasis added), language that focuses on the act of asserting a direct claim, to the exclusion of the insurer's act of defending the claim.  The panel also cited *Compton v. D'Amore*, 475 N.Y.S. 2d 463 (N.Y App. Div. 1984), a case stating that "[i]nsurers are deemed to be real parties in interest only when direct actions are *maintained against* them," *id*. at 466 (emphasis added) -- language that similarly restricts the relevant fact to the assertion of the claim, not the insurer's decision to actively defend itself against the claim.  Moreover, and as noted in text, *Broyles* elsewhere described the second exception as arising when the insurer "*must defend* itself against" a direct action, 878 F.2d at 1404 (emphasis added), a phrase denoting not the actual presentation of a defense but the legal necessity of a defense in order to avoid a default or other adverse judgment -- this necessity standing in contrast to the third exception, which is applicable when the insurer has "only the option, not the absolute obligation," to defend.  *Id*. at 1405.

18

915 So. 2d 557, 562, 564 (Ala. 2005). A defendant is fraudulently joined, and its citizenship is to be ignored, if "there is no possibility the plaintiff can establish a cause of action against the resident defendant." *Stillwell v. Allstate Insurance Co.*, 663 F.3d 1329, 1332 (11th Cir. 2011) (internal quotes omitted). If, as *Pontius* teaches, an unripe breach of contract claim against a UM/UIM carrier must be dismissed for lack of subject matter jurisdiction, there would seem to be no possibility the plaintiff could establish a cause of action as to such an unripe claim.

### 3. Control of the Litigation.

The third *Broyles* exception requires that the UM/UIM carrier "assume primary and visible control of the litigation." 878 F.2d at 1404.[15] This control must be "primary and visible," *id.*; "visible and substantial," *id.*; "substantial," *id.* at 1405; "active, visible and primary." *Id.* at 1406. The panel repeatedly emphasized that it is control, and not merely "participation," that is necessary to implicate the third exception.[16] Control is measured by participation, but not just any participation will do. "[M]inimal" participation is of course insufficient, *id.* at 1405; the insurer's participation must be at

---

[15] There is one situation in which *Broyles*' third exception apparently can apply even absent exercised control by the insurer: when the insurer "inherits the sole duty to defend" or "incur[s], through default, the primary obligation to defend the lawsuit because it bec[omes] the *only* defendant in the lawsuit." 878 F.2d at 1404, 1405 (emphasis added). This could occur, for example, if the tortfeasor is unknown or has been discharged in bankruptcy. *Id.* at 1405. No such situation is presented here.

[16] The third exception applies when the insurer "exercises visible and substantial *control* over the litigation." 878 F.2d at 1404 (emphasis added). "[T]he question of whether [the insurer] is a real party turns on whether it exercised substantial *control* of this action." *Id.* at 1405 (emphasis added). Tennessee law confers "only the option, not the absolute obligation, to take substantial *control* of the defense in these types of lawsuits." *Id.* (emphasis added and omitted). Because the tortfeasor employed his own counsel, the insurer "did not substantially *control* the litigation." *Id.* (emphasis added). "Unless the insurance company interjects itself into the controversy in such a way that it has direct liability and/or active, visible and primary *control* of the litigation, its citizenship should not be considered for purposes of diversity jurisdiction." *Id.* at 1406 (emphasis added). "[I]f [the insurer] either cannot or does not exercise the option to actively and visibly defend the lawsuit, it lacks the requisite *control* over the litigation to be a real party in interest for diversity purposes." *Id.* (emphasis added).

19

least "substantial." *Id*. And because control must be "active" and "visible," so too must be the relevant participation. *Id*. at 1406 (unless the insurer "actively and visibly defend[s] the lawsuit, it lacks the requisite control over the litigation" for its citizenship to matter). These latter limitations presumably exclude from consideration such things as responding to discovery requests (visible but passive) and privately strategizing with the tortfeasor's counsel (active but invisible).

Alfa was served with process on or about October 28, 2025. (Doc. 1 at 13). Its active, visible participation in this lawsuit thereafter consists of the following: (1) consenting to removal on November 10, (Doc. 1-7); (2) filing an answer on November 19, (Doc. 7); and (3) filing a notice of election to opt out of proceedings, also on November 19. (Doc. 9). It seems hardly necessary to state that this conduct does not amount to "substantial" participation in the litigation, much less participation reflecting any degree of "control of" or "control over" the litigation. Sister courts agree. *See Germinaro*, 623 F. Supp. 3d at 1285, 1288-89 (joining in removal, filing an answer, and filing a notice of opt-out did not reflect primary and visible control of the litigation); *Stevens I*, 2022 WL 108016 at *1-2, *4 (consenting to removal, filing an answer, responding to requests for admission, seeking a protective order, propounding limited discovery, and filing a notice of election to opt out of proceedings did not reflect primary and visible control of the litigation); *Stevens v. Edwards*, 2022 WL 17083395 at *1-2 (M.D. Ala. 2022) ("*Stevens II*") (Marks, C.J.) (monitoring discovery by attending the plaintiff's deposition, and taking notes but not asking questions, "does not rise to the level of active participation"); *Oliver v. Rodriguez*, 2008 WL 928328 at *1-2 (M.D. Ala. 2008) (Albritton, D.J.) (deeming Alfa a nominal party despite its joining in removal, filing an answer, and filing a notice of election to opt out of litigation). In *Broyles* itself, the insurer filed a motion to dismiss on jurisdictional grounds, filed a motion to sever coverage issues from liability issues, filed a second motion to dismiss on jurisdictional grounds, and participated, at least minimally, in the liability trial, all while remaining a nominal party. 878 F.2d at 1401, 1405.

20

The Court now comes, at long last, to the narrow argument raised by the plaintiff: that, "because [Alfa] had not opted out at the time of removal, [it] should not be considered a 'nominal' party for purposes of determining whether" diversity jurisdiction exists. (Doc. 15 at 19). Absent a pre-removal opt-out, the plaintiff says, Alfa "was an active participant in the litigation at the time of removal." (Doc. 24 at 14; *accord* Doc. 15 at 3). For support, the plaintiff relies exclusively on Judge DuBose's opinion in *Parker v. Morton*, 2019 WL 1645207 (S.D. Ala. 2019). The plaintiff is correct that "diversity jurisdiction is determined ... at the time of removal," *Showan v. Pressdee*, 922 F.3d 1211, 1214 n.1 (11th Cir. 2019) (internal quotes omitted), but Alfa's failure to opt out prior to removal is not dispositive of, or even relevant to, the jurisdictional issue.

The plaintiffs in *Parker* were Georgia citizens. They had named a UM/UIM carrier (also a Georgia citizen) as a defendant but had been granted leave to dismiss the carrier when questions arose as to subject matter jurisdiction. The carrier then sought leave to intervene. 2019 WL 1645207 at *1-2. The Court denied leave to intervene because it did not consider the insurer to be a nominal party under the two cases on which the insurer relied. It found *Broyles* distinguishable because Tennessee law had no opt-out procedure similar to Alabama's, and it found *Toole* distinguishable because the carrier there had opted out, whereas the insurer in *Parker* "has decidedly not opted out of the litigation," since it had previously answered the complaint, now sought to intervene, and "also intends to propound discovery." *Id*. at *4.[17] *Parker*'s reasoning is somewhat unclear, and its facts are far removed from those of the instant case. To the uncertain extent that *Parker* supports the plaintiff's position that, when a plaintiff names its UM/UIM carrier as a defendant pursuant to *Lowe*, the carrier cannot be a nominal party for diversity purposes unless it has opted out prior to removal, the Court must respectfully disagree.

As discussed in Part I.C.2, the second *Broyles* exception applies only if the insurer "must" defend the action, and a UM/UIM carrier named a defendant under *Lowe* need not

---

[17] The proposed discovery was limited to "initial discovery," for the purpose of helping the insurer decide whether it should or should not opt out. *Id*. at *3.

defend unless it elects to do so or fails within a reasonable time after service of process to elect not to do so.  Rarely will a reasonable time expire prior to removal, and it did not expire in this case, where removal occurred a mere thirteen days after service of process.

As noted, the third *Broyles* exception applies only if the insurer "*assume*[*s*]" control of the litigation.  878 F.2d at 1404 (emphasis added).  The insurer becomes a real party "because it ... *exercises*" control over the litigation.  *Id*. (emphasis added).  The insurer must "*interject* itself into the controversy" in order to have the necessary control.  *Id*. at 1406 (emphasis added).  These are action verbs, and the insurer must take action before the requisite control can be established.  *Broyles* emphasizes that the resident insurer's citizenship must be ignored under its third exception unless the insurer has "*active* ... control" of the litigation because it has "*actively* ... defend[ed]" the lawsuit.  *Id*. (emphasis added).  The failure to opt out is quintessentially passive and thus inherently incapable of negating nominal party status.  The presence of an opt-out signals there will be no active participation or control in the future, and its absence may signal probable future participation or control, but the absence of an opt-out cannot possibly demonstrate the presence of past participation and control or substitute for the lack of past participation and control.  The plaintiff's *ipse dixit* to the contrary, (Doc. 24 at 14), is plainly incorrect.[18]

Judge Marks has reached a similar conclusion.  In *Germinaro*, she explained that the *Broyles* analysis "extends more broadly" than the fact and timing of an opt-out, such that a post-removal opt-out did not compensate for the fact that "Alfa here did nothing before removal to meet one of the three" *Broyles* exceptions, including that of

---

[18] Because real-party status under *Broyles*' third exception requires activity by the UM/UIM carrier within the confines of the litigation, such a defendant's initial status in the litigation must be that of a nominal party.  The insurer subsequently "becomes" a real party based on its exercise of control over the litigation.  878 F.2d at 1404.  Judge Marks has identified a "baseline presumption" that a UM/UIM carrier made a defendant pursuant to *Lowe* is a nominal party.  *Stevens I*, 2022 WL 108016 at *4; *accord Germinaro*, 623 F. Supp. 3d at 1288.  Whether or not it rises to the level of a legal presumption, it is certainly true that such a defendant ordinarily will scarcely have time to actively participate in the litigation, and to a degree sufficient to establish active control of the litigation, in the typically brief interval between service of process and removal.

"assum[ing] primary and visible control of the litigation."  623 F. Supp. 3d at 1289 (internal quotes omitted); *accord Stevens I*, 2022 WL 108016 at *5.

DTNA discerns an additional argument, buried in the factual portion of the plaintiff's brief:  that Alfa's opt-out is of no moment because it was conditional.  (Doc. 15 at 3-4; Doc. 21 at 11 n.4).  Just as the lack of an opt-out cannot of itself make a UM/UIM carrier named as a defendant under *Lowe* a real party under *Broyles*' third exception, the lack of an unconditional opt-out cannot do so, and for the same reason:  neither a missing opt-out nor a conditional opt-out shows that the insurer has already, actually, and actively participated in the litigation and assumed control over it.  *See Tompkins v Craft*, 2008 WL 5381250 at *2 (M.D. Ala. 2008) (Albritton, D.J.) (the conditional nature of Alfa's opt-out did not matter, "because at least at this point, Alfa has done even less to participate in the case than did the insurer in *Broyles*").

### D.  Conclusion.

In summary, the Court concludes that the *Broyles* analysis controls and that none of its exceptions apply so as render Alfa a real party, either at the moment of removal or presently.  Because Alfa is a nominal party for purposes of determining diversity jurisdiction, complete diversity exists, and the plaintiff's motion to remand for lack of subject matter jurisdiction is due to be denied.[19]

---

[19] As the plaintiff notes, diversity jurisdiction must exist at the moment of removal.  As the Court notes, a non-diverse UM/UIM carrier named as a defendant pursuant to *Lowe* usually will be a nominal party when removal occurs, such that complete diversity exists at the time of removal.  If the insurer thereafter files an opt-out notice, and does so before it has sufficiently participated in the litigation to become a real party, it is unlikely ever to become a real party to the litigation.  Even if the insurer files no such notice, it presumably would not become a real party until and unless it participates in the litigation to the requisite degree.  Should the insurer do so, the question arises whether its change in status, from nominal party to real party, would at that point eliminate the Court's subject matter jurisdiction and require remand.

The Eleventh Circuit recognizes "the principle that once jurisdiction, always jurisdiction." *Wright Transportation, Inc. v. Pilot Corp.*, 841 F.3d 1266, 1272 n.9 (11th Cir. 2016) (internal quotes omitted).  Thus, for example, diversity jurisdiction "is not destroyed by post-filing changes to party citizenship." *Id*. at 1271.  There are, however, exceptions to the

23

## II. Unanimity.

"When a civil action is removed solely under section 1441(a), all defendants who have been properly joined and served must join in or consent to the removal of the action." 28 U.S.C. § 1446(a)(2)(A). "The failure to join all defendants in [the removal] is a defect in the removal procedure." *Hernandez v. Seminole County*, 334 F.3d 1233, 1237 (11th Cir. 2003). Dmyterko was properly served but did not join in or consent to removal. The plaintiff argues that his failure to do so requires remand. DTNA argues that Dmyterko is a nominal party and that his failure to join in or consent to removal is therefore immaterial.

It has long been the rule that "removal requires the consent of all defendants." *Lapides v. Board of Regents*, 535 U.S. 613, 620 (2002) (citing *Chicago, Rock Island & Pacific Railroad Co. v. Martin*, 178 U.S. 245, 248 (1900)).[20] It has also long been understood that only "the defendants who are necessary and not merely nominal parties must be joined in the removal proceedings." *Bailen v. Deitrick*, 84 F.2d 375, 375-76 (1st Cir. 1935).[21]

*Tri-Cities* is the only known binding decision addressing this exception. The *Tri-Cities* panel, citing *Martin*, confirmed that "removal procedure requires that all

---

general rule, *id*. at 1272 n.9, of which an insurer's post-removal change of status from nominal party to real party may be one. The *Broyles* panel did not look only to the insurer's conduct when suit was filed in federal court but instead assessed its participation all the way through trial, which may suggest that scrutiny of the insurer's participation is to be ongoing throughout the litigation. *See also Stevens II*, 2022 WL 17083395 at *1-2 (denying a renewed motion to remand based on the insurer's litigation conduct following denial of the first motion to remand and finding that "Alfa remains a nominal party"). Both because Alfa, post-removal, has not participated in the litigation to any meaningful degree and because the action is due to be remanded on other grounds, the Court need not resolve this legal issue.

[20] Section 1446(b)(2)(A) essentially codified this principle with its 2011 enactment.

[21] The nominal-party exception to the rule of unanimity is sometimes attributed to *Shattuck v. North British & Mercantile Insurance Co*., 58 F. 609 (8th Cir. 1893). While the proposition appears plainly in a headnote, it is more difficult to discern within the opinion itself.

24

defendants join in the removal petition."  427 F.2d at 326-27.  The panel then addressed the nominality exception as follows:

> However, nominal or formal parties, being neither necessary nor indispensable, are not required to join in the petition for removal.  *Shattuck v. North British and Mercantile Insurance Co.*, 8 Cir., 1893, 58 F. 609; *Stonybrook Tenants Association, Inc. v. Alpert*, 194 F.Supp. 552 (D. Conn. 1961).  The test of whether or not a named defendant is a nominal party is if 'his role in the law suit is that of a depositary or stakeholder ***'.  *Colman v. Shimer*, 163 F.Supp. 347, 350 (W.D. Mich. 1958).  Another court has said that:
>> 'The ultimate test of whether the *** defendants are *** indispensable parties is whether in the absence of the (defendant), the Court can enter a final judgment consistent with equity and good conscience which would not be in any way unfair or inequitable to plaintiff.'
> *Stonybrook Tenants Association, Inc. v. Alpert, supra*, 194 F. Supp. 559.

*Tri-Cities*, 427 F.2d at 327.  The Court then added that "[t]he question of whether or not a defendant is a nominal party depends on the facts in each case."  *Id*.

DTNA does not rely on *Tri-Cities*.  It relies instead on *Thermoset*, a case that cited *Tri-Cities* in the Section 1332 context.  The *Thermoset* panel first stated that *Tri-Cities* "defined nominal or formal parties as those that are neither necessary nor indispensable to the action."  *Id*. at 1317 (internal quotes omitted).  The panel then stated that *Tri-Cities* identified "the ultimate test for whether a defendant is nominal" to be as expressed in the final quoted paragraph from *Tri-Cities*.  *Id*. (internal quotes omitted).  DTNA's argument is built on these two propositions.  As discussed below, the first proposition correctly states the law, but DTNA misunderstands what constitutes a "necessary" party in this context.  As also discussed below, the second proposition is incorrect.

As discussed in Part I.A, the relevant line is drawn between nominal or unnecessary parties on the one hand and necessary or indispensable parties on the other.  As also explained in Part I.A, in order to ignore a party's citizenship, it is not enough to show that the party is dispensable; it must be further shown that the party is unnecessary.  DTNA concedes as much.  (Doc. 1 at 15; Doc. 21 at 11, 13).

For purposes of diversity jurisdiction, "indispensable parties [a]re defined as 'Persons who not only have an interest in the controversy, but an interest of such a nature

25

that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience.'" *Lumbermen's Mutual*, 348 U.S. at 52 (quoting *Shields*, 58 U.S. at 139). The *Stonybrook* Court repeated this definition almost *verbatim*, 194 F. Supp. at 557, before reframing the "ultimate test" as "whether, in the absence of [the defendant], the Court can enter a final judgment consistent with equity and good conscience which would not be in any way unfair or inequitable to plaintiffs." *Id*. at 559. The *Tri-Cities* Court then quoted this portion of *Stonybrook* as the "ultimate test of whether the ... defendants are ... indispensable parties." 427 F.2d at 327 (internal quotes omitted). So far, so good. The *Thermoset* Court, however, stated that *Tri-Cities* made this the ultimate test "for whether a defendant is *nominal*." 849 F.3d at 1317 (emphasis added). With respect, this is incorrect. As *Tri-Cities* (and the Supreme Court precedent from which it descends) make clear, failing to satisfy the "ultimate test" prevents the party from being indispensable, but it does not prevent the party from being necessary and thus not nominal.

Because *Tri-Cities* is the prior panel precedent, the *Thermoset* panel lacked authority to alter it, particularly within the Section 1446 context. Nor did *Thermoset* intend or attempt to do so. Instead, the panel sought only to repeat what "[w]e ... said" in *Tri-Cities*, 849 F.3d at 1317, and it simply erred in its repetition. Moreover, its misstatement is dicta, not holding: because the panel concluded that the non-diverse defendant's absence "would have put [the plaintiff] at risk of receiving inadequate relief," *id*. at 1318, it reached the same result (*viz*., non-nominality) that it would have reached using the correct *Tri-Cities* formulation.[22] For all these reasons, the Court employs the original, *Tri-Cities* test, under which a court's ability to fashion a judgment in the

---

[22] *See* n. 12, *supra*.

defendant's absence that will not be unfair to the plaintiff determines whether the defendant is dispensable, not whether it is nominal.[23]

With this background, the Court turns to DTNA's argument as expressed in its notice of removal. DTNA first offers several reasons it believes the Court "could enter a fair and equitable final judgment for Plaintiff even if Dmyterko were not a party." (Doc. 1 at 15-19). DTNA is operating under the misapprehension that the ability of the Court to enter such a judgment renders Dmyterko a nominal party. Because DTNA's arguments, even if accepted, would at most prevent Dmyterko from being an indispensable party, without showing him also to be an unnecessary party, the Court need not address them.[24]

DTNA next challenges Dmyterko's status as a necessary party, going about it in two related ways: (1) a vehicle driver is not a necessary party; and (2) a joint tortfeasor is not a necessary party. (Doc. 1 at 16-18). For the first proposition, DTNA relies on *Hickerson v. Enterprise Leasing Co., LLC*, 818 Fed. Appx. 880 (11th Cir. 2020), and *McCrory v. Costco Wholesale Corp.*, 584 F. Supp. 3d 1091 (S.D. Ala. 2022). Both cases were decided under Rule 19, not Section 1332 or Section 1446. For the second proposition, DTNA relies on *Temple v. Synthes Corp.*, 498 U.S. 5 (1990), and *Lyons v. O'Quinn*, 607 Fed. Appx. 931 (11th Cir. 2015). These cases as well were decided under Rule 19. That rule "address[es] party joinder, not federal-court subject matter jurisdiction." *Lincoln Property Co. v. Roche*, 546 U.S. 81, 90 (2005). As the Supreme

---

[23] For these reasons, the Court respectfully parts company with sister courts that have taken this portion of *Thermoset* at face value. *See, e.g., Robert L. Strauss, P.A. v. Gemini Insurance Co.*, 742 F. Supp. 3d 1184, 1194 (S.D. Fla. 2024); *Thomas Machinery, Inc. v. Everest National Insurance Co.*, 2020 WL 2616183 at *4 (S.D. Fla. 2020).

[24] The Court nevertheless lists them, as follows: (1) principles of *respondeat superior* and of joint and several liability allow the plaintiff to recover from 4US for any liability attributed to Dmyterko; (2) Dmyterko's status (incarcerated, deportable, without known assets) makes it unlikely the plaintiff could recover on any judgment entered against him; and (3) Dmyterko's invocation of the Fifth Amendment means he will be effectively absent from this case.

Court noted, Rule 19 "'shall not be construed to extend or limit the jurisdiction of the United States district courts ....'" *Id*. (quoting Fed. R. Civ. P. 82).[25]  Whether Dmyterko is or is not a necessary party for purposes of Rule 19 has little if anything to do with whether he is a necessary party for purposes of the rule of unanimity.

DTNA "does not seek Dmyterko's dismissal here ....  Instead, he will remain a defendant (and jointly and severally liable) -- and the jury may consider his conduct in assessing fault." (Doc. 21 at 12-13).  DTNA effectively concedes, as it must, that Dmyterko -- who is alleged to have driven the Freightliner negligently and/or wantonly and thereby directly caused the death of the plaintiff's decedent -- may, if these allegations are proved, be held liable for his conduct.  That is exactly why he cannot be a nominal party.  "A named defendant who admits involvement in the controversy and would be liable to pay a resulting judgment is not 'nominal' in any sense except that it is named in the complaint." *Lincoln Property*, 546 U.S. at 93.  Indeed, a contrary result would sound, and be, absurd:  the active perpetrator of a tort causing another's death as a mere nominal, inconsequential defendant.  In fact, such a defendant "has a vital interest in th[e] case." *Id*. at 92-93.

In its opposition brief, DTNA repackages two arguments it originally made, futilely, under the "ultimate test" standard as demonstrating that Dmyterko lacks a real and substantial stake in the litigation and/or substantial control over the litigation.  (Doc. 21 at 19-23).  The Court now turns to them.

As to Dmyterko's stake in the litigation, DTNA cites several lower court decisions from outside the Eleventh Circuit for the proposition that "corporations that lack assets and/or are defunct are nominal parties because they lack any 'real stake' in the outcome of the case." (Doc. 21 at 19).  It cites other such cases for the proposition that uninsured driver-tortfeasors have insufficient stake in the litigation when they are named for the procedural purpose of allowing the plaintiff to pursue her UM/UIM carrier. (*Id*. at 20-21).

---

[25] The current version of Rule 82 is stylistically different from, but substantvely identical to, the version quoted in *Lincoln Property*.

Addressing these arguments in reverse order, the plaintiff has not named Dmyterko as a defendant merely to allow her to pursue Alfa, since Alabama permits a direct action against a UM/UIM carrier without the insured first pursuing the tortfeasor to judgment.[26]  She has stated recognized causes of action against Dmyterko seeking monetary damages for his uncontested connection with the death of the plaintiff's decedent and, as DTNA rightly concedes, (Doc. 21 at 12-13), he is exposed to direct financial consequences should a jury find, as alleged, that he negligently or wantonly killed the plaintiff's decedent.  DTNA's cases are therefore inapposite.

DTNA's showing of Dmyterko's current impecuniousness is not merely underwhelming, it is utterly absent, consisting entirely of an *ipse dixit* that he has "no discernible assets," (Doc. 1 at 18), unaccompanied by even a statement of what efforts DTNA has undertaken to uncover such assets.  Dmyterko's status as a foreign national allegedly subject to deportation once his pending criminal charges are resolved and any imposed prison time served does not, as DTNA imagines, (*id*.), say anything about his assets.  On the other hand, that Dmyterko is here on a work visa and was in fact employed at the time of the subject incident, (*id*.), affirmatively suggests the existence of assets, however modest in comparison to his potential financial liability.

In any event, the Court is unprepared to accept DTNA's premise that a tortfeasor who is in every other sense a non-nominal party can be reduced to nominal status simply because he is poor.  Cases involving "defunct" corporations are not persuasive, because Dmyterko is not defunct and can continue to earn income or otherwise acquire assets against which a judgment could run.  Such a judgment is good for ten years and can be revived for another ten years,[27] and Dmyterko, for all DTNA or anyone else knows, could be a millionaire by then, whether by hard work, good investments, a patented invention, inheritance, a lucky lottery number, a successful personal injury lawsuit, or any number

---

[26] *Ex parte State Farm*, 401 So. 3d at 1095-96.

[27] Ala. Code §§ 6-9-190 to -196.

29

of other possibilities.  The Court is in full sympathy with Judge Baker's examination of this issue in *Brandenburg*, which includes citation to a wealth of authority rejecting DTNA's position.  2019 WL 5692742 at *5.

As to Dmyterko's control of the litigation, DTNA notes that, before removal (indeed, before DTNA and other defendants were added by amendment), Dmyterko moved for a stay of proceedings against him.  (Doc. 1-5 at 32-33).  The state court granted the motion with respect to the eliciting of testimony from Dmyterko in any form but otherwise permitted the proceedings, including discovery, to proceed.  (*Id*. at 41).[28] DTNA argues that Dmyterko will not "meaningfully participate in this case," and "will not exercise any control in this litigation, much less substantial control," because he has invoked his Fifth Amendment rights.  (Doc. 21 at 21-23).

The Court does not share DTNA's conception of participation and control for purposes of nominality.  As addressed in Part I.C.3, *Broyles* addressed control in the context of a UM/UIM insurer, not named as primary defendant to a direct action but merely given notice of an action against the tortfeasor and the option to participate in the action.  In that specific context, general principles of liability insurance law required that the insurer be deemed nominal unless it assumed control over the litigation.  In *Navarro*, on which *Broyles* relied for its "control" language, the question was whether the trustees (as opposed to the beneficiaries) of a business trust were the real parties, and in that specific context the trustees' control of the litigation (extended by the declaration of trust), along with their legal title to, and control over, the trust assets, reflected that they, rather than the beneficiaries, were the real parties.  446 U.S. at 464-65.  Neither *Navarro* nor *Broyles* establishes a general rule that an otherwise non-nominal party is nevertheless to be deemed nominal unless it controls the litigation.[29]  On the contrary, *Broyles* stated

---

[28] DTNA's assertion to the contrary notwithstanding, the state court's order does not "provid[e] for additional limitations on discovery."  (Doc. 21 at 22).

[29] *Broyles* did state that, "[i]n general, a real party in interest is a party that has a real and substantial stake in the litigation and who exercises *substantial control* over the litigation," 878

that a "direct stake in the litigation" can make a party a real party in interest "regardless of its degree of participation."  878 F.2d at 1405.  Under *Lincoln Property*, as discussed above, Dmyterko has about as direct a stake in this litigation as it is possible to have, and no degree of passivity regarding his defense of that direct stake could transform him from a real party in interest into a merely nominal party.

In any event, Dmyterko does in fact control that portion of the litigation that a single defendant in a multi-defendant case can be expected to control, *viz.*, its own litigation position, objectives, strategy, and tactics, and he has affirmatively participated in this litigation to advance them.  Dmyterko has answered the complaint, moved for a stay, answered the amended complaint, and filed a response and objection to DTNA's motion for jurisdictional discovery.  (Doc. 26).  Pursuant to the state court order, he is bound to respond to discovery that does not elicit his testimony, and he is free to engage in whatever discovery he wishes, to file any motions he wishes, and otherwise to protect his interests in any manner he wishes.

Yes, DTNA says, this is what Dmyterko has done and what he is obligated to do and free to do, but what he *wants* is "to be treated as absent" and "to be excused from participation."  (Doc. 21 at 22-23).  That request has been denied by the state court, and Dmyterko's desire for a different scenario cannot substitute for reality.[30]  Even had Dmyterko been granted a stay of all proceedings as to him, he would remain a real party under *Lincoln Property*, because his exposure to liability and a resulting judgment against him, and thus his "vital interest" in the case, would remain unchanged; the stay would merely delay the day of reckoning until the criminal proceedings are resolved (probably long before this involved products liability action is ready for trial).

---

F.2d at 1403 (emphasis in original), and it cited *Navarro* for this proposition.  As noted in text, while *Navarro* found control of the litigation to be significant in the specific context of a suit by business trustees, it did not declare such control to be a universal element of non-nominal status. Because *Broyles* was confined to its own narrow context involving UM/UIM insurers, its statement of a more general rule is dicta, not holding.  *See* n. 12, *supra*.

[30] Indeed, DTNA concedes that Dmyterko "will not be" absent.  (Doc. 21 at 27).

31

DTNA ultimately concedes that none of its arguments, standing alone, is sufficient to render Dmyterko a nominal party; it proposes instead that the Court cumulate them because "together, they establish his nominal status." (Doc. 21 at 16). DTNA cites several lower court decisions from outside the Eleventh Circuit that appear to take such an approach, but the Court declines to join them. Neither the Supreme Court nor the Eleventh Circuit appears to have blessed such a patchwork methodology, DTNA's authorities advance no discernible legal rationale for doing so, and the Court will not search for one.

In any event, neither Dmyterko's alleged poverty nor his invocation of the Fifth Amendment even remotely suggests that he is a nominal party under governing law, and adding two zeroes together still comes to zero. The other matters that DTNA would throw in the pot -- the concepts of joint and several liability and *respondeat superior* -- are offered only to show that the plaintiff can recover her full damages from other defendants. (Doc. 21 at 14). As already noted, even if such a circumstance exists, it goes only to whether Dmyterko is an indispensable party, not to whether he is a necessary (and therefore non-nominal) party.

DTNA's brief in opposition to remand concludes by introducing an additional reason for deeming Dmyterko to be a nominal party. DTNA argues that "the circumstances of his representation raise substantial questions about whether he has already reached some type of agreement or settlement with" the plaintiff. (Doc. 21 at 27). Such an agreement, DTNA says, would mean that Dmyterko lacks "a substantial stake in the litigation" under *Broyles* and is thus a nominal party. (*Id*. at 23; Doc. 22 at 8). Should the Court find the existing record insufficient to establish Dmyterko's nominality, DTNA moves for leave to conduct jurisdictional discovery to supplement the record. (Doc. 22).

The plaintiff argues that DTNA "waived" this argument by not including it in the notice of removal. (Doc. 24 at 5, 14; Doc. 25 at 6-9). The plaintiff's authorities do not support that proposition. Instead, they preclude a removing defendant from tardily (after the removal window closes) asserting a new jurisdictional basis (such as federal question

32

jurisdiction), identifying a new basis for finding diversity of citizenship (such as the fraudulent joinder of a non-diverse defendant), or correcting a procedural defect (such as lack of consent). As DTNA is attempting none of these, the plaintiff's authorities are inapposite. DTNA in its notice of removal: (1) asserted that all procedural requisites to removal were satisfied; (2) asserted specifically that the unanimity requirement was met, and was met because Dmyterko is a nominal party; and (3) offered multiple reasons why he should be considered a nominal party. Because the plaintiff has failed to demonstrate that DTNA is legally barred from later offering another reason that Dmyterko should be classified as a nominal party, the Court proceeds to address its argument.

DTNA cites no authority for the proposition that a defendant, upon entering a settlement agreement, or an agreement to have no judgment entered or enforced against him, thereafter lacks sufficient stake in the litigation to be a real party. The Court, however, is aware that some courts have expressed similar propositions. *Bradley v. Maryland Casualty Co*., 382 F.2d 415, 419 (8th Cir. 1967) (where third-party plaintiff and third-party defendants entered a "written stipulation ... as to the compromise and settlement," "[f]or all practical purposes [the third-party defendants] went out of the lawsuit when that stipulation was executed," and "[t]hey were then no more than nominal parties" for purposes of consent to removal); *Ledwell v. Ravenel*, 843 Fed. Appx. 506, 507-08 (4th Cir. 2021) (once the plaintiff settled her claims with the individual defendant, he lacked a "palpable interest" in the case and was thus a nominal party for purposes of consent to removal). Based on these cases, as well as the reasonableness of the proposition, the Court accepts for present purposes that the existence of such an agreement would render Dmyterko a nominal party and obviate his consent to removal.

DTNA carefully avoids alleging that either a settlement agreement or an agreement not to pursue Dmyterko to judgment exists. Instead, it asserts that the circumstances "raise substantial questions about whether" such an agreement exists. (Doc. 21 at 27; *accord id*. at 2). Those circumstances may be summarized as follows:

33

When Dmyterko appeared in response to a criminal complaint on May 9,[31] three days after the accident, he did not request appointed counsel; instead, retained counsel ("Tisdale") appeared on his behalf.  When asked by DTNA's counsel prior to removal of this action, Tisdale said she was being paid by Dmyterko's family.  Dmyterko required a Ukrainian interpreter, and the criminal court did not locate one until November.  (Doc. 21 at 3, 6).

The plaintiff filed suit, against Dmyterko only, on August 14.  Tisdale filed an answer 72 minutes later, two weeks before Dmyterko was served with process.  The insurer of 4US provided civil counsel ("Potts") for Dmyterko on September 10.  On September 15, the plaintiff moved the state court for a stay of the civil action.  Potts signed the motion, with Tisdale shown as additional counsel.[32]  Similarly, Potts signed Dmyterko's answer to the amended complaint, with Tisdale shown as additional counsel. (Doc. 21 at 3-5).

When counsel for DTNA contacted Potts to solicit Dmyterko's consent to removal, he advised that Tisdale would make that decision and that he would acquiesce in it.  Potts stated he had not spoken with Dmyterko.  Tisdale advised DTNA's counsel that she had instructed Dmyterko not to speak with Potts or anyone else.  Despite several requests from DTNA's counsel, Tisdale refused to consent to removal.  She explained that she was seeking to curry goodwill with the plaintiff in the criminal case.  (Doc. 21 at 5-6).

Finally, Tisdale provided an affidavit in support of the plaintiff's motion to remand.  (Doc. 21 at 6).

After reciting all of this, DTNA is unable to explain the significance of much of it. Take Tisdale's representation.  Is the Court supposed to suspect that Dmyterko's family is not really underwriting his defense?  Why?  Is it really implausible that he contacted his family after being charged and that they hired Tisdale to represent him?  Is it really more

---

[31] Unless otherwise noted, all dates herein are 2025.

[32] DTNA's statement that Potts and Tisdale both signed the motion, (Doc. 21 at 25), is incorrect.

plausible that the plaintiff's decedent, within 72 hours of the accident, had decided to assist her loved one's killer by subsidizing his criminal defense?[33]

Or the interpreter. Is the Court supposed to assume that, because the state court in a rural county had no access to a Ukrainian interpreter for several months, Tisdale (who is based in Mobile) could not have been communicating with her client? Why? Is it supposed to assume that none of Dmyterko's family speaks English? Why? And how does a language barrier indicate the plaintiff and Dmyterko are in cahoots?

It is clear that Tisdale received the complaint as, or even before, it was filed. DTNA characterizes this fact as evidence of "pre-filing coordination between counsel." (Doc. 21 at 2). It is not unusual, however, for a plaintiff to share the complaint with a defendant before filing it, often to show seriousness or to put teeth in a settlement demand. More generally, it is not unusual for a plaintiff to have discussions with a defendant prior to filing suit. There is thus nothing inherently suspicious about the timing of Dmyterko's answer.

Nor is there anything inherently suspicious about Tisdale taking the lead in Dmyterko's representation. She was hired to represent Dmyterko's criminal interests, and neither she nor Dmyterko was required to entrust his civil defense to insurance counsel without coordination to ensure his overall interests were protected. The criminal charges, which could land Dmyterko in prison for a decade or more, obviously were of more importance than potential civil liability, especially given DTNA's insistence that Dmyterko has no real assets to protect.

DTNA insists that Dmyterko's refusal to consent is "inconsistent with his civil litigation interests," because the decedent was a beloved local high school coach, and a federal jury pool would dilute the emotional pull of his death at the hands of an outsider. (Doc. 21 at 23-24). Again, however, the civil litigation is the lesser of Dmyterko's

---

[33] Tisdale has submitted an affidavit confirming under oath her previous statement to DTNA's counsel that her "fees for the representation of Mr. Dmyterko have been and are being paid by his family members and no one else." (Doc. 26-1 at 2). DTNA ignores this evidentiary repudiation of its conspiratorial narrative.

worries, and it would be completely rational for counsel to sacrifice a civil advantage in hopes of obtaining favorable consideration in the criminal context. That DTNA might have reasoned differently does not suggest that Tisdale's stated reason for not consenting to removal is false, much less that her refusal stemmed from either a pre-existing settlement or an agreement to insulate her client from liability or entry of judgment against him.

That leaves Tisdale's affidavit. DTNA marvels that a defendant would provide assistance to the party suing him, and it says that such "cooperat[ion]" reflects that Dmyterko has no real stake in the litigation. (Doc. 21 at 2, 25-26). Tisdale's affidavit may have been unnecessary,[34] but it is perfectly consistent with counsel's stated goal of currying favor with the victims' loved ones for purposes of defending the criminal charges.

Put simply, there is no there there. All DTNA has shown is that Tisdale is pursuing a litigation strategy with which it disagrees. Which may be why DTNA seeks discovery of Tisdale, including: how she came to represent Dmyterko; how she is being paid; and all communications between Tisdale and plaintiff's counsel regarding this case or the criminal case, including but not limited to any agreement, or communication concerning a possible agreement, to limit or eliminate Dmyterko's civil exposure. (Doc. 21 at 27-28).

"Parties have a qualified right to jurisdictional discovery, and a district court abuses its discretion if it completely denies a party jurisdictional discovery." (Doc. 22 at 6). Although DTNA purports to rely for this proposition on *Eaton v. Dorchester Development, Inc.*, 692 F.2d 727 (11th Cir. 1982), it mischaracterizes its holding: "[I]t is appropriate to speak in terms of a qualified 'right' to jurisdictional discovery *when a court's jurisdiction is genuinely in dispute*." *Id*. at 731 n.7 (emphasis added, internal

---

[34] The only apparent purpose of the affidavit is to confirm that Tisdale and her client do not consent to removal, (Doc. 17-1), and the notice of removal had already conceded as much. (Doc. 1 at 12). DTNA insinuates that the redundancy of Tisdale's affidavit is somehow evidence of an agreement between the plaintiff and Dmyterko. (Doc. 21 at 26-27). In a word, no.

36

quotes omitted); *accord Watson v. Kingdom of Saudi Arabia*, 159 F.4th 1234, 1273 (11th Cir. 2025).  There is no genuine dispute here, only DTNA's unwillingness to accept that Dmyterko has different priorities (staying out of prison) and strategies (appeasing his victims' survivors) than DTNA thinks he should have.

Nor has DTNA shown that its proposed discovery is "jurisdictional."  The *Eaton* Court carved out a place for "jurisdictional discovery" due to "the importance of subject matter jurisdiction," and it held that the lower court's "dismissal for lack of subject matter jurisdiction was premature."  692 F.2d at 729, 731.  By its own admission, DTNA does not seek discovery relevant to the Court's subject matter jurisdiction but to whether its removal suffers from a "procedural defect."  (Doc. 22 at 6).  DTNA posits that such a defect "divests the Court of subject-matter jurisdiction or precludes the Court from exercising such jurisdiction," (Doc. 27 at 7), but it cites no authority allowing post-removal discovery on that basis, and the Court will not undertake a search on its behalf.

DTNA next tries to crack the nut a different way.  Even if Dmyterko has not already settled with the plaintiff or entered some other type of agreement that strips him of any ongoing stake in this litigation, he could be "collud[ing]" with the plaintiff to defeat removal.  (Doc. 21 at 26 n.7).  In that event, Dmyterko could be considered to be fraudulently joined, and a fraudulently joined defendant's consent to removal is not required.  *Diaz v. Kaplan University*, 567 F. Supp. 2d 1394, 1403 (S.D. Fla. 2008).  DTNA invokes *Diaz* and suggests that Dmyterko is fraudulently joined under this standard.  (Doc. 21 at 26 n.7).  The Eleventh Circuit appears not to have adopted the *Diaz* framework, but the Court assumes for present purposes that it would do so.

"To prevail on an allegation of collusion, removing defendants must provide clear and convincing evidence of collusion to counter the non-consenting defendant's reasons for wanting to remain in state court."  *Diaz*, 567 F. Supp. 2d at 1403.  As evidence of collusion, DTNA points to Tisdale's filing of an answer barely an hour after the complaint was filed (months before removal), along with her provision of an affidavit to the plaintiff (after removal).  For reasons already provided, these circumstances, whether viewed in isolation or in the context of the other circumstances addressed above, do not

37

suggest collusion about anything, and certainly not about withholding consent to removal; much less are they "clear and convincing evidence" of such collusion. Moreover, Tisdale has directly sworn under oath that there is no deal with anyone in exchange for Dmyterko's refusal to consent to removal, (Doc. 26-1), and plaintiff's counsel, in a pleading filed subject to Rule 11, has denied any collusion. (Doc. 24 at 14). DTNA, which ignores these denials in its reply brief, is left with nothing but its subjective suspicions of chicanery, which neither demonstrate collusion nor place the possibility of such collusion genuinely in dispute so as to support pre-remand discovery.

The *Diaz* Court stated that removing defendants can meet their burden "by showing plaintiff has no real good faith intention to prosecute the non-consenting defendant or seek a joint judgment." 567 F. Supp. 2d at 1403. DTNA says it has made such a showing, given Dmyterko's pending criminal charges, immigration status, and (assumed) lack of (current) assets. (Doc. 21 at 26 n.7). Conceptually, collusion with a defendant and disinterest in recovery from that defendant are two different things (though both may be ways of demonstrating fraudulent joinder in the unanimity context). In any event, and for reasons already provided, the matters on which DTNA relies will not of themselves sustain a conclusion that a plaintiff has no good faith intent to pursue a defendant to judgment.

In summary, the plaintiff has asserted as a defect in the removal procedure the failure of Dmyterko to join in or consent to removal. DTNA asserts that Dmyterko's lack of consent is excused because he is a nominal party, but it has not met its burden of establishing that status. Because Dmyterko's consent is both essential and missing, the plaintiff's motion to remand for this defect in removal procedure is due to be granted.

## CONCLUSION

For the reasons set forth above, DTNA's motion for leave to conduct jurisdictional discovery is **denied**, and the plaintiff's motion to remand is **granted**.  This action is **remanded** to the Circuit Court of Clarke County.

DONE and ORDERED this 30th day of March, 2026.

s/ WILLIAM H. STEELE<br>
UNITED STATES DISTRICT JUDGE